# 23-6307-cr

## United States Court of Appeals

### *for the*

## Second Circuit

UNITED STATES OF AMERICA,

*Appellee,*

— v. —

DEANNA OLBERT, JAMES REED, AKA FATTS, JARIEL COBB,
AKA Doobie, AKA Black, JAHAAN MCDUFFIE, AKA Wanka,
DESTENEE BELL, AKA K., DESHEMA CLARK,

*Defendants,*

DEANDRE WILSON, AKA D.,

*Defendant-Appellant,*

---

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NEW YORK

## BRIEF FOR DEFENDANT-APPELLANT

JAMESA J. DRAKE
DRAKE LAW, LLC
*Attorneys for Defendant-Appellant*
P.O. Box 56
Auburn, Maine 04212
(207) 330-5105

CP COUNSEL PRESS     (800) 4-APPEAL • (334427)

# Table of Contents

**Jurisdictional Statement** ...................................................1

**Statement of the Case** ....................................................1

    I.     The government's case...........................................3

         A. Drug dealing ...................................................3

         B. September 15, 2019 .........................................8

         C. The aftermath ................................................11

         D. The investigation ...........................................19

    II.    The defense case ..............................................22

**Questions Presented** ....................................................24

**Argument Summary** .....................................................24

**Argument**...................................................................26

    **Point 1:**   **The district court erred by prohibiting
                  defendant from introducing portions of
                  Brady's grand jury testimony. ...........................26**

    I.     Preservation and standard of review ...................26

         A. Preservation...................................................26

         B. Standard of review ........................................29

    II.    The legal framework............................................30

    III.   Application.........................................................33

**Point 2:** **Defendant's convictions for conspiracy to obstruct justice (Count 8); obstruction of justice (Count 10); conspiring to use fire to commit a felony (Count 11); and use of a fire to commit a felony (Counts 12 and 13), are unsupported, as a matter of law.......................37**

I.      Preservation and standard of review ...............................37

         A. Preservation..................................................37

         B. Standard of review ....................................................40

II.     The legal framework ........................................................40

         A. Rule 29 motions ...........................................................40

         B. Duplicity ....................................................41

         C. Vicarious criminal liability.............................................42

III.    Application.............................................................44

**Point 3:** **The jury's finding that the sale of at least five kilograms of cocaine was attributable to defendant, through his participation in the narcotics conspiracy alleged in Count 1, was unsupported as a matter of law.......................47**

I.      Preservation and standard of review ...................................47

         A. Preservation..................................................47

         B. Standard of review ......................................................49

II. The legal framework.................................................................50

III. Application...............................................................................52

**Conclusion**.................................................................................**57**

# Table of Authorities

## Cases

*Chambers v. Mississippi*, 410 U.S. 284 (1973)..................................31, 32

*Crane v. Kentucky*, 476 U.S. 683 (1986)..................................................32

*Holmes v. South Carolina*, 547 U.S. 319 (2006) ....................................35

*Jackson v. Virginia*, 443 U.S. 307 (1979)...........................................44, 55

*Kotteakos v. United States*, 328 U.S. 750 (1946)....................................60

*Lore v. City of Syracuse*, 670 F.3d 127 (2d Cir. 2012)............................31

*Pennsylvania v. Ritchie*, 480 U.S. 39 (1987) ..........................................33

*Pinkerton v. United States*, 328 U.S. 640 (1946) ........................... passim

*Taylor v. Illinois*, 484 U.S. 400 (1988) ....................................................33

*United States v Pauling*, 924 F.3d 649 (2d Cir. 2019)..........55, 56, 58, 62

*United States v. Archer*, 977 F.3d 181 (2d Cir. 2020) ............................51

*United States v. Blackmon*, 839 F.2d 900 (2d Cir. 1998).......................48

*United States v. Bruno*, 383 F.3d 65 (2d Cir. 2004)...............................46

*United States v. Dickerson*, 508 U.S. 1216 (2d. Cir. 1975) ....................48

*United States v. Dolah*, 245 F.3d 98 (2d Cir. 2001) ...............................33

*United States v. Gallerani*, 68 F.3d 611 (2d Cir. 1995) .........................46

*United States v. Gaviria*, 740 F.2d 174 (2d Cir. 1984) ..........................49

*United States v. Gershman*, 31 F.4th 80 (2d Cir. 2022) ......................... 43

*United States v. Gupta*, 747 F.3d 111 (2d Cir. 2014) ............................. 34

*United States v. Jackson*, 335 F.3d 170 (2d Cir. 2003) .......................... 56

*United States v. Johnson*, 513 F.2d 819 (2d Cir. 1975) ......................... 49

*United States v. Jones*, 965 F.2d 1507 (8th Cir.), *cert. denied* 121

    L.Ed.2d 261 (1992) ................................................................... 57

*United States v. Lumpkin*, 192 F.3d 280 (2d Cir. 1999) ........................ 30

*United States v. Manarite*, 448 F.2d 583 (2d Cir. 1971) ........................ 60

*United States v. Martinez*, 54 F.3d 1040 (2d Cir. 1995) ................... 56, 59

*United States v. Martinez*, 987 F.2d 920 (2d. Cir. 1993) ....................... 57

*United States v. Parkes*, 497 F.3d 220 (2d Cir. 2007) ........................... 47

*United States v. Paulino*, 445 F.3d 211 (2d Cir. 2006) .................... 30, 35

*United States v. Rea*, 958 F.2d 1206 (2d Cir. 1992) ............................... 47

*United States v. Rosario*, 7 F.3d 319 (2d Cir. 1993) ............................. 36

*United States v. Salvador*, 820 F.2d 558 (2d Cir. 1987) ........................ 35

*United States v. Soto*, 716 F.2d 989 (2d Cir. 1983) ............................... 49

*United States v. Sturdivant*, 244 F.3d 71 (2d Cir. 2001) ....................... 45

*United States v. Thomas*, 274 F.3d 655 (2d Cir. 2001) .......................... 55

*United States v. Tropeano*, 252 F.3d 653 (2d Cir. 2001) ....................... 30

*United States v. Turner*, 2023 U.S. App. LEXIS 20674, 2023 WL

    5091187 (Aug. 9 2d Cir. 2023) ............................................................ 44

*United States v. Zabare*, 871 F.2d 282 (2d Cir. 1989) ........................... 60

*Williamson v. United States*, 512 U.S. 594 (1994) ................................. 34

## Statutes

18 U.S.C.  1512(k) ..................................................................................... 2

18 U.S.C. § 1291 ........................................................................................ 1

18 U.S.C. § 1512(c)(1) ............................................................................... 2

18 U.S.C. § 1951(2) ................................................................................ 1, 2

18 U.S.C. § 1951(a) .................................................................................... 1

18 U.S.C. § 2 ............................................................................................... 2

18 U.S.C. § 3231 ........................................................................................ 1

18 U.S.C. § 841(b)(1)(D) ........................................................................... 2

18 U.S.C. § 844(h) ...................................................................................... 2

18 U.S.C. § 844(i) ....................................................................................... 2

18 U.S.C. § 844(m) ..................................................................................... 2

18 U.S.C. § 844(n) ...................................................................................... 2

18 U.S.C. § 924(c)(1)(A)(iii) ..................................................................... 2

18 U.S.C. § 924(j)(1) .................................................................................. 2

21 U.S.C § 848(e)(1)(A) ....................................................... 2

21 U.S.C. § 841(a)(1) ........................................................... 2

21 U.S.C. § 841(b)(1)(A) ...................................................... 1

21 U.S.C. § 841(b)(1)(B) ...................................................... 1

21 U.S.C. § 846 ................................................................... 1

Rule 804(b)(3)(A) ............................................................... 34

**Other Authorities**

Daniel S. Medwed, *Secrets of Chambers: The Constitutional Right to Present a Defense at Middle Age*, 66 Ariz. L. Rev. 571 (2024) ............ 30

**Rules**

Fed R Evid. 804(b) ............................................................. 31

Fed. R. App. P. 4(b)(1)(A) ................................................... 1

Fed. R. Crim. P. 29 ....................................................... 38, 40

Fed. R. Crim. P. 33 ........................................................... 38

Fed. R. Evid. 804(b)(3) .................................................. passim

**Constitutional Provisions**

U.S. Const. amend. V ................................................ 28, 31, 34

U.S. Const. amend. VI ......................................................... 30

U.S. Const. amend. XIV ................................................. 30, 41

## Jurisdictional Statement

The district court had jurisdiction because the defendant, Deandre Wilson, was charged with violating federal criminal laws. 18 U.S.C. § 3231. On March 29, 2023, the district court entered a Judgment against defendant, and this Court has jurisdiction over appeals of final judgments. 18 U.S.C. § 1291. On April 3, 2023, defendant timely filed a notice of appeal. Fed. R. App. P. 4(b)(1)(A).

## Statement of the Case

Following a trial lasting six weeks with over 50 testifying witnesses, a jury found defendant guilty of multiple charges relating to the murders of three people and drug trafficking, as follows:

- Count 1: narcotics conspiracy, 21 U.S.C. § 846, involving five kilograms or more of cocaine, one kilogram or more of heroin, and 100 kilograms or more of marijuana;[1]

- Count 3: Hobbs Act robbery, 18 U.S.C. § 1951(a) and (2);

---

[1] The count numbers are denominated as set forth in the redacted indictment. (Dkt. 557). Count 1 of the indictment also charged the narcotics conspiracy as involving butyryl fentanyl, but the jury did not answer specific questions as to that drug type or make any quantity findings because the charge did not implicate the increased statutory penalties under 21 U.S.C. § 841(b)(1)(A) or (B). *See* A—92; Dkt. 636, at 1 n.1 (Decision and Order regarding defendant's motion to vacate his convictions and for a new trial).

- Count 4: Murder while engaged in a narcotics conspiracy, 21 U.S.C §§ 848(e)(1)(A), and 18 U.S.C. § 2;

- Count 5: Discharge of a firearm in furtherance of a crime of violence and drug trafficking crimes, 18 U.S.C. § 924(c)(1)(A)(iii) and 2;

- Counts 6 and 7: Discharge of a firearm causing death in furtherance of a crime of violence and drug trafficking crimes, 18 U.S.C. § 924(c)(1)(A)(iii), 924(j)(1), and 2;

- Count 8: Conspiracy to obstruct justice, 18 U.S.C. 1512(k);

- Counts 9 and 10: Obstruction of justice, 18 U.S.C. § 1512(c)(1) and 2;

- Count 11: Conspiracy to use fire to commit a felony, 18 U.S.C. § 844(m);

- Counts 12 and 13: Use of fire to commit a felony, 18 U.S.C. § 844(h) and 2;

- Count 14: Conspiracy to damage and destroy a vehicle used in interstate commerce by fire, 18 U.S.C. § 844(n);

- Count 15: Damaging and destroying a vehicle used in interstate commerce by fire, 18 U.S.C. § 844(i) and 2;

- Count 17: Possession with intent to distribute marijuana, 21 U.S.C. §§ 841(a)(1), (b)(1)(D), and 18 U.S.C. § 2.

The jury acquitted defendant of Count 2 (Hobbs Act conspiracy) and Count 16 (maintaining a drug-involved premises), and the district court

2

granted the government's motion to dismiss Count 5 (discharge of a firearm in furtherance of a crime of violence and drug trafficking crimes). (Tr. 3861, 3864, Dkt. 634). The jury found defendant guilty of all the other charges. (Tr. 3872-79). The district court principally sentenced defendant to an "[a]ggregate total of [three] life sentences plus 30 years." (A—124).[2]

## I.   The government's case

### A.   Drug dealing

Jariel Cobb has been a drug dealer in Buffalo, New York, for so long that he has drug arrests going back to the 1990s. (Tr. 2317-18). Focusing on the conspiracy alleged in this case, Jariel resumed dealing drugs in 2016 after his release from prison. (Tr. 2331-32). Between 2016 and 2018, Jariel and his brothers Byron and James Cobb used two different suppliers in the New York City and New Jersey areas to purchase cocaine

---

[2] The Judgment provides: "The defendant is hereby committed to the custody of the United States Bureau of Prisons to be imprisoned for a total term of: Life on Counts 1 and 4, 20 years on Counts 3, 8-11, 14, and 15, and 5 years on Count 17, all to run concurrently. Life on each of Counts 6 and 7 to run consecutively to all other counts. 10 years on Count 12 to run consecutively to all other counts. 20 years on Count 13 to run consecutively to all other counts. Aggregate total of 3 life sentences plus 30 years." (A—124).

and heroin, respectively.  (Tr. 1610, 2331-33).  Roughly once a month, Jariel and his brothers would find women willing to drive downstate and bring the drugs back concealed in their bodies.  (Tr. 1610-12, 2352-53).  Sometimes, the brothers would recruit someone to test the heroin for purity, as well.  (Tr. 2354).  Product in hand, Jariel would "stretch" or "cut" the cocaine and heroin and resell his portion of it to users and other dealers.  (Tr. 1612-13, 2354-56).  Initially, the brothers were getting about 100 grams of heroin; eventually, that grew to 300 grams of heroin "[e]very couple of weeks."  (Tr. 1613-14).

After Byron was arrested in 2018, Jariel and his brother James found a new supplier in California, who provided marijuana.  (Tr. 2334-35).[3]  The marijuana cost between $400 and $1400 a pound, so Jariel and James pooled money with other people (not including defendant) to buy marijuana from this supplier; Jariel was in charge of the group.  (Tr. 1598-99, 2336-37, 2340, 2343).  Jariel would send four or six people to California, by airplane, each with money to pay the supplier and, in return, the supplier would send the drugs to Buffalo through the postal

---

[3]    Contradicting himself, Jariel also testified that his relationship with the California supplier lasted from roughly 2016 to 2018.  (Tr. 2351).

service. (Tr. 1600, 2337-40). The first package the supplier sent was about 10 pounds; eventually, the supplier was sending a total of 40 to 50 pounds of marijuana at a time, divided into smaller allotments, to about nine locations in Buffalo, at Jariel's direction. (Tr. 1601, 2339-42; *see also* Tr. 1632-33). In the beginning, Jariel and James "were getting tens roughly every couple of weeks," but eventually, it "was maybe once a week for 40 pounds." (Tr. 1601-2). They received 40-pound deliveries for "about a year and a half." (Tr. 1602). Jariel would then redistribute the marijuana to his investors depending on how much money each person put in, and he would sell his share. (Tr. 1607-8, 2344-45).

Starting around 2018, Jariel and his associates began buying kilograms of cocaine from a California supplier. (Tr. 1604, 2346). As before, Jariel pooled money with others to purchase the cocaine, he sent people by airplane to California with money to purchase the drug (occasionally, Jariel would mail money to the supplier), and the supplier would send the cocaine back to Buffalo through the postal service. (Tr. 2347-48). It varied, but Jariel and his investors would purchase "[s]ometimes it would be four [kilos] in one package, two in another, sets of threes, like three sets of threes." (Tr. 2349; *see also* Tr. 1605). The

5

most the men ever received in one week was 20 kilograms of cocaine. (Tr. 1605-6). Jariel divided what he received among the investors, keeping at least a kilogram for himself to resell. (Tr. 1607, 2350).

During a large portion of this time, defendant was incarcerated. (Tr. 2379). Jariel would give some of the money he made selling drugs to defendant, by way of defendant's family members. (Tr. 2379-80). Around February 2019, Jariel learned that defendant was out of prison and the men reconnected. (Tr. 2380, 2391).[4] Over the course of about thirty days, Jariel gave defendant about $5,000. (Tr. 2393-95). Jariel also gave defendant a pound of "high end" marijuana for free. (Tr. 2396-98). Jariel encouraged defendant to sell the marijuana with defendant's cousin to make more money to keep for himself; Jariel did not expect anything from defendant in return. (Tr. 2397-98). But defendant returned the marijuana to Jariel and asked Jariel to sell it for him. (Tr. 2397-2400). Jariel refused and gave the marijuana to defendant. (Tr. 2401).

---

[4] James did not have a relationship with defendant after defendant was released from prison. According to James: "We would just see each other in passing or at my mom's house, we didn't really have a relationship." (Tr. 1636). James never spent time with defendant on his own. (Tr. 1637).

6

Defendant knew that his cousins dealt drugs for Jariel, and defendant proposed that Jariel make him "basically be the middleman," meaning that Jariel would supply "a few pounds" of marijuana and a kilogram of cocaine to defendant, and defendant, in turn, would supply drugs to his cousins. (Tr. 2406-7). Jariel agreed. (Tr. 2408, 2451).

In February 2019, when one of Jariel's minions got arrested, James and Jariel needed to find a new supplier. (Tr. 1631, 1636, 2394, 2411). Jariel met two of the victims, Miguel and Dhamyl, through an intermediary. (Tr. 2413-17, 2420). Jariel gave Dhamyl $30,000 for a kilogram of cocaine. (Tr. 2415). Jariel knew that Dhamyl and Miguel were from Florida. (Tr. 2421). Dhamyl and Miguel charged higher prices than his California supplier, but Jariel "dealt with it because they was bringing it to my doorstep." (Tr. 2423). Between about March 2019 and September 2019, Dhamyl and Miguel (together or separately) made a total of nine or ten trips to Buffalo to supply Jariel with drugs; each time, they brought between three and six kilograms of cocaine. (Tr. 2424). On two of those occasions, Miguel's girlfriend Nicole came along, too. (Tr. 2436-37). Jariel would keep a kilogram for himself and break it down into smaller quantities for resale, and then he would sell the remainder

in "full kilo" amounts. (Tr. 2427). Jariel would pay Dhamyl and Miguel "up front" for the drugs. (Tr. 2427).

After Jariel agreed to sell drugs to defendant (for resale to defendant's cousins), and after Jariel had established Dhamyl and Miguel as his suppliers, defendant had two opportunities to purchase a kilogram of cocaine, but he missed out both times. (Tr. 2451). Jariel called defendant to alert him that Dhamyl and Miguel were in town, but defendant either did not have the money at the time or he missed Jariel's calls. (Tr. 2451-52). Defendant did not know who Jariel's suppliers were. (Tr. 2452).

## B.    September 15, 2019

Dhamyl and Jariel arranged for a delivery of drugs on September 15, 2019, and Jariel told defendant that was happening. (Tr. 2454). Jariel told defendant to purchase a kilogram of cocaine for $33,000, resell it to his cousins with a $6,000 markup, and then defendant and Jariel would split the profit. (Tr. 2456-57). But defendant proposed instead that Jariel let him keep the entire $6,000 profit, telling Jariel, "then you don't have to look out for me no more." (2457). Jariel agreed because he wanted to help defendant "since he came home" from prison. (Tr. 2457).

8

Defendant told Jariel he had $30,000, so Jariel agreed to meet-up with defendant and James and, eventually, the men traveled together by car to a house on Roebling Avenue. (Tr. 1678, 2457-61, 2474). James thought it was unusual for defendant to be included. (Tr. 1678).

Jariel arranged for Dhamyl to come to Roebling Avenue. (Tr. 2467-69, 2479-80). The plan was to purchase one kilogram of cocaine for defendant and then more for Jariel himself. (Tr. 2476).

Jariel told James and defendant that Dhamyl and Miguel "don't want to meet nobody." (Tr. 2475). Jariel told defendant that the deal would take place in the kitchen, and he instructed defendant to wait in a back bedroom. (Tr. 2475, 2484). James stayed either in the bathroom or "in the back somewhere." (Tr. 2485).

When Dhamyl and Miguel arrived at Roebling Avenue, they parked their white minivan in the driveway. (Tr. 2482-83). Miguel was driving and his girlfriend, Nicole, was in the passenger seat. (Tr. 2485). Jariel let Nicole came into the house to use the bathroom. (Tr. 2486). After Nicole was finished, Jariel led her back out of the house and back to the minivan. (Tr. 2487). When Nicole went outside, Dhamyl came in carrying a "book bag." (Tr. 2487-88).

Dhamyl set the bag on the counter and Jariel "cut a check" in a kilogram to test "if it was alright." (Tr. 2488). Jariel then took the drugs to the bedroom where defendant was waiting, and Jariel let defendant check the drugs. (Tr. 2488-89). Dhamyl waited in the kitchen. (Tr. 2490). Defendant agreed that the drugs were good, so Jariel took defendant's money and the kilo back to the kitchen. (Tr. 2488-90). Dhamyl "took out the stacks and started counting the money" and made a comment like, "what the...". (Tr. 2490, 2497). One of defendant's stacks of money had some cash, but the rest "looked like it was cut up newspaper or coupons or like old food stamps." (Tr. 2497).

At that moment, James saw defendant come rushing out of the bathroom and running toward the kitchen wearing a ski mask; defendant had a gun. (Tr. 1714-15, 1726). Defendant ran past Jariel and hit the top of Dhamyl's head. (Tr. 2490-91). James heard a thud, so he came to the kitchen to investigate. (Tr. 1715, 1726). James saw Dhamyl laying on the floor. (Tr. 1715). Dhamyl had a head wound, but it didn't start bleeding "until a few minutes later." (Tr. 2491). Dhamyl started moving on the ground and was struck two more times by defendant. (Tr. 2491-

10

92). Blood "started running onto the kitchen floor." (Tr. 2492; *see also* Tr. 1720).

James started panicking; he kept saying, "what happened, what happened" and "that is why I didn't want to come here, that is why I didn't want to come." (Tr. 2493). Defendant "was kind of calm." (Tr. 2493). Jariel told defendant: "I was like, what is you doing, they about to come in here. There is people outside in the van. And he [defendant] – then he was like, there is people in the van?" (Tr. 2493, *see also* Tr. 1716).

Defendant went outside and Jariel followed him. (Tr. 1716, 2493, 2495). Jariel saw defendant fire three shots into the van, killing Miguel and Nicole. (Tr. 2495-96). According to Jariel, this was "not at all" how things were supposed to go. (Tr. 2496). Jariel was "not at all" expecting "any of that" to happen. (Tr. 2505). The time was about 6:00 p.m. (A—94; Tr. 1752).

### C. The aftermath

After firing shots into the van, defendant started trying to push Miguel out of the driver's seat. (Tr. 1717, 2497). Once defendant pushed Miguel over enough – James observed defendant "[t]ake the driver from the front seat and put [him] on the back seat" – defendant got into the

11

car and discovered, "there is a kid in here, there's a kid in here." (Tr. 1718, 1727, 2498). Miguel and Nicole's son was in his car seat in the back row. (Tr. 165, 1719, 2919).[5]

Defendant drove the minivan, with the baby and his two dead parents inside it, while Jariel followed behind in his car. (Tr. 1721, 1751, 2498-99). James stayed in the house, "lit a blunt" and started smoking marijuana. (Tr. 1723).

At one point, Jariel pulled up to the minivan and he heard the baby saying, "Mom, my mom, my bleeding mom, my mom need to go to the hospital." (Tr. 2499, 2508-09). Referring to the boy, defendant kept telling Jariel, "he seen my face, he seen my face," which Jariel took to mean that defendant was concerned the child could identify him. (Tr. 2509). Jariel asked defendant to give him the boy, but defendant refused. (Tr. 2510). Jariel told defendant that there was blood on the outside of the car. (Tr. 2514; *see also* Tr. 2517).

Eventually, Jariel lost defendant in traffic, and Jariel returned to Roebling Avenue. (Tr. 2518-19, 2576). When he returned, Jariel told

---

[5]     Throughout, defendant omits mention of the child's name to protect his privacy.

James that defendant put the van "on the tracks." (Tr. 1724). The time was approximately 6:30 p.m. (*See e.g.* Tr. 2513).

Jariel decided to move Dhamyl's body to the basement. (Tr. 2577-78). Jariel did not want to take the body outside where onlookers might become suspicious, so he decided to cut it up. (Tr. 1727, 2578 (Jariel: "I just wanted to get it out of sight and then *I* decided to cut it up.") (emphasis added). After helping Jariel carry the body to the basement, James went back upstairs; he did not participate in the dismemberment. (Tr. 1728-29, 1731). James cleaned the kitchen. (Tr. 2584).

Jariel found a pitchfork-type instrument, but it was ineffective. (Tr. 2580-01). So, Jariel left to retrieve two saws and an axe. (Tr. 2581-83; *see also* Tr. 1729). When he returned to Roebling, Jariel noticed blood on the bushes and weeds on the side of the house, so he pulled them out of the ground and swept the side of the house with some water. (Tr. 2585-87). Jariel then went to the basement to chop Dhamyl's body and, to prevent blood splatter, he covered the body with garbage bags. (Tr. 2588-89). Jariel also stepped into a garbage bag and pulled it up to his waist to make sure blood did not splatter onto him. (Tr. 2589, *see also* Tr. 1733). Jariel started sawing Dhamyl's body, but the saw had a safety feature

13

that prevented it from cutting flesh. (Tr. 1730, 2590). Jariel switched to the other saw, but that didn't work, either. (Tr. 2591).

Jariel used the axe to chop Dhamyl's body into pieces; he put the pieces into about eight garbage bags; with James's help, Jariel put the garbage bags in his car; and then Jariel and James cleaned the basement. (Tr. 1733, 1735, 2591-94). Jariel then drove from Roebling Avenue to a house on Box Avenue, with the intention of burning Dhamyl's body and the materials used to clean Roebling Avenue, in a firepit in the backyard. (Tr. 1761, 2596-97). It was Jariel's idea to burn the Dhymyl's body in the fire pit. (Tr. 2596-97). The time was approximately 10:45 pm. (Tr. 1749, 1752-53).

When he arrived at Box Avenue, Jariel ripped open the garbage bags, poured the body parts into the fire pit, and then dumped the bag in after it. (Tr. 2601). Jariel and James used a pitchfork, shovel, rake and ice pick to continuously move the body parts around the fire to "make sure it's burned all the way down." (Tr. 2601, 2604-5). At times, Jariel and James poured lighter fluid on the fire to make sure it kept burning. (Tr. 2602).

At around midnight, Jariel told defendant that he was on Box Avenue. (Tr. 2607). Jariel asked defendant "where he was at" and defendant said that he went to a music concert at a nearby amusement park. (Tr. 1732, 2607-08). Jariel told defendant he was burning Dhamyl's body in the firepit, and defendant said he would come over after the concert. (Tr. 1756, 2608).

At around 12:20 a.m., defendant arrived at Box Avenue. (Tr. 2611-12). Defendant observed the fire pit with Dhamyl's remains, and defendant agreed to show Jariel where he put the van. (Tr. 1764, 2614). The plan was to set fire to the van, as well. (Tr. 1780, 2614). Jariel gave a gas can to someone from the neighborhood and instructed him to buy some gas. (Tr. 1772-73, 2616-17).[6] When the man returned with the gas can, defendant and Jariel left in Jariel's car to go to the van. (Tr. 1775, 2621). The time was approximately 12:30 a.m. (Tr. 2620).

Instead of going directly to the van, defendant and Jariel stopped to get another can of gas. (Tr. 2624-25). At the gas station, the men

---

[6] Defendant kept the victims' cell phones and he tried to destroy them; eventually, defendant threw the phones off a bridge into water. (Tr. 2618-19).

15

purchased a lighter, some dishwashing liquid and a big jug of water. (Tr. 2628).

Jariel asked defendant "what did he do with the kid and [defendant] said he still got him." (Tr. 2621). Defendant said the boy was still in the van, to which Jariel replied, "well, the kid probably got out." (Tr. 2621). Defendant answered that the boy was "tied up." (Tr. 2621).

At around 1:50 a.m., the men drove to the location where defendant hid the van. (Tr. 2630-32). Once Jariel discovered where the van was parked (on the east side of town), Jariel told defendant it couldn't be burned there because it would make it obvious that he was involved. (Tr. 2632-33). Defendant "said he had a place." (Tr. 2633).

At around 2:15 a.m., Defendant and Jariel tried to conceal their identities and began walking toward the van. (Tr. 2633-36). Jariel splashed water on the van to remove blood on the passenger door, and he broke the rest of the passenger window. (Tr. 2639-40). As he did that, defendant was "[g]etting the kid out the back." (Tr. 2640). The boy said, "Mommy need to go, to go to the hospital." (Tr. 2640). Defendant untied the child and placed him in the passenger seat. (Tr. 2542). The boy said, "Mommy was bleeding. Mommy need to go to the…hospital." (Tr. 2643).

16

For a second time, defendant drove the van with the boy and his dead parents inside, selecting a new location to burn it. (Tr. 2646, 2650). Jariel followed in his own car. (Tr. 2645-46). Around 2:55 p.m., defendant parked the van in an industrial area of town behind a large building. (Tr. 183, 2650-51).

When Jariel caught up with the van, he saw defendant "getting the kid out" and pouring gas on the van and onto Nicole's body in the front passenger seat. (Tr. 2651-52). At one point, defendant went inside the van and poured gas on the interior. (Tr. 2653). The boy "just kept…talking about his mom needed to go to the hospital." (Tr. 2652). Defendant poured gas on the engine, poured a trail of gas leading away from the van, and then lit the ground on fire. (Tr. 2653-54). The van "blew up and started rolling" and the boy kept saying, "Mommy in the van, mommy in the fire." (Tr. 2654). The boy tried to go towards the van, but defendant stopped him. (Tr. 2654).

Jariel and defendant, with the boy in tow, returned to Jariel's car. (Tr. 2656-57). As they drove, Jariel told defendant that they needed to "get rid of the kid" and "drop him off." (Tr. 2657). Defendant kept saying, "no, the kid seen my face and he got my DNA." (Tr. 2657). Jariel replied,

17

"I got water and dishwashing [soap], and I'm going to wash him off and put him on a porch and drive off." (Tr. 2657).

Jariel stripped the boy of his clothes, "washed the kid up and put his clothes in the car." (Tr. 2659). Jariel explained: "I took the dishwashing liquid and…I wiped him off, wiped his feet real good, his hair, his arms, his legs…then I took the water again and wiped him off again and then I took him up on a porch and knocked on a door." (Tr. 2659). As this was happening, the boy complained that he was cold and he "was asking where his mom was at." (Tr. 2659).

Jariel left the boy on a porch with his diaper on, and he was discovered by the homeowner at around 8:00 a.m. the next morning. (Tr. 147, 2659). The homeowner called 911 and said: "I found a little boy on my porch. Please come." (Tr. 154). The police took the boy all around the neighborhood to see if he belonged to anybody, before taking him to social services. (Tr. 155). When he arrived, the boy was covered in fresh bug bites all over his face and forehead. (Tr. 312). During an interview with a caseworker, the boy asked for a white crayon to draw a car. (Tr. 317-18). Knowing little about what had just transpired, the caseworker

tried to correct the boy because, with a white crayon, she couldn't see what the car looked like. (Tr. 317-18).

Except for the time that James left to get more wraps for marijuana and left to go to his mother's house to get more wood, James stayed behind at the firepit on Box Avenue tending the fire and making sure that everything burned. (Tr. 1759-60, 1763, 1776, 1781). At around 3:30 a.m., defendant returned to Box Avenue and threw a ski mask and gloves into the fire. (Tr. 1791-92). Defendant left Box Avenue sometime after 4:50 a.m. to go to work. (Tr. 1794, 1796).

Later on September 16, 2019, James went to Home Depot to buy more wood, an axe to cut to wood, and a new shovel because the wood handle on the shovel used to stir the fire had begun to burn. (Tr. 1795-99). James kept the fire burning for a total of about 24 hours. (Tr. 1799).

### D. The investigation

In addition to testimony from Jariel and James, the government presented to the jury:[7]

- Testimony from the woman who discovered the boy on her front porch; a social services caseworker who interviewed the boy; and the boy's grandmother (Miguel's mother);

---

[7]  This list is not intended to be exhaustive and it is not presented here in any particular order.

- Testimony from the co-owners of the building behind which the van was burned and the employees who discovered the van and called 911;

- Testimony from multiple law enforcement witnesses who investigated and collected evidence including the victims' remains from the location where the van was discovered, DNA swabs inside Roebling Avenue, and bone fragments found in the fire pit at Box Avenue; testimony about the surveillance system discovered at Box Avenue; and the actual surveillance footage which depicted defendant's, James' and Jariel's movement in close proximity to the fire pit on September 15 and 16, 2019;

- Testimony from an anthropologist who analyzed the remains of the decedents, and medical examiners, all of whom opined about the cause and manner of the victims' deaths and Dhamyl's dismemberment;

- Testimony from the general manager of the motel where the decedents rented a room; and testimony from the law enforcement officers who searched that room;

- Testimony from law enforcement officers about the discovery of a package of drugs shipped to one of Jariel's subordinates, and her subsequent arrest;

- Testimony from the woman who introduced Jariel to Miguel; and testimony from some of the people who worked for Jariel in the drug trade;

- Testimony from law enforcement witnesses about the various surveillance tools employed in and around the Buffalo area, *i.e.* pole cameras and license plate readers, as well as hours of video footage depicting the movement of defendant, James, and Jariel throughout the Buffalo area on September 15 and 16, 2019;

- Testimony about the means used to track the locations of the decedents' bodies after the shooting, using e-mail accounts and cellular data; testimony about cellular telephone records; and the records themselves;

- Testimony from citizens who discovered evidence pertinent to the case, *i.e.* a woman who discovered a firearm permit, and a scuba diver who discovered at the bottom of a lake the weapon believed to be involved in the shooting;

- Testimony about DNA collected from Roebling Avenue, and ballistics evidence pertaining to spent shell casings found in the driveway at Roebling Avenue; and the results of those tests, which confirmed, *inter alia*, that Nicole's and Miguel's remains were found in the van, and Dhamyl's remains were found in the fire pit.

- Testimony from a law enforcement witness who searched defendant's residence and discovered a scale and packaged marijuana;

- And, after the jury returned with this verdict, the government presented evidence that before the events alleged in the instant case, defendant had been convicted of violating New York Penal Law § 125.2501, second-degree murder, for which he served more than 12 months' imprisonment.

21

## II.    The defense case

In addition to vigorously cross-examining many of the government's witnesses, but especially James and Jariel regarding their self-serving cooperation agreements and hopes for leniency, defendant elicited testimony that he was gainfully employed as a laborer and selected to take on the responsibilities of a foreman. (Tr. at 265). Defendant took advantage of the resources at the Center for Employment Opportunities, which helps people released from prison to find work. (Tr. 3342-43). Defendant successfully completed "the life skills portion" of the training they provide. (Tr. 3344).

Defendant also established that one of the swabs taken from Roebling Avenue and submitted for forensic testing was negative for the presence of blood, (Tr. 2908-2911). Other swabs from Roebling Avenue tested positive for the presence of blood, (Tr. 2912-15), and they were subsequently used to test for DNA evidence, (*see e.g.* Tr. 2916). Nicole and Miguel, as well as James and Jariel, were all excluded as possible contributors. (Tr. 2923-24). Defendant was excluded, as well. (Tr.

2927).[8] Defendant was also excluded as a possible contributor of DNA found on swabs taken from Jariel's car. (Tr. 2941, 2945). Defendant was excluded as a possible contributor of DNA found on the gun allegedly used to kill the victims. (Tr. 2928-2935).

James' and Jariel's mother testified that she has known defendant for about 40 years, and she never saw him possess weapons. (Tr. 3350-53). Defendant's mother testified that Jariel never gave her any money to give to defendant while he was incarcerated. (Tr. 3360-61).

Defendant's overarching theory of the case was that he was not involved in a drug conspiracy, and that James and Jariel murdered the victims and falsely pointed the finger at defendant. (*See e.g.* Tr. 3758-59). During summation, defendant emphasized, "the only people that say [defendant] is at…Roebling inside committing these crimes are [Jariel] and [James]." (Tr. 3773-74).

Defendant will develop additional facts as needed within each assignment of error.

---

[8]     Dhamyl was not excluded as a possible contributor to a sample collected from the basement handrail at Roebling Avenue; defendant was excluded as a contributor to that sample. (Tr. 2940-41).

23

## Questions Presented

1.    Did the district court err by prohibiting defendant from introducing portions of an unavailable witness's grand jury testimony?

2.    Did the government present legally sufficient proof to support convictions on Counts 8 and 10 through 13, charges relating to conspiracy to obstruct justice, conspiracy to use fire to commit a felony, and the respective substantive offenses?

3.    Did the government present legally sufficient proof that five kilograms or more of cocaine was reasonably foreseeable to defendant given his membership in the narcotics conspiracy?

## Argument Summary

1.    The district court erred by excluding portions of Richard Brady's grand jury testimony as inadmissible under Rule 804(b)(3) of the Federal Rules of Evidence.  However, such testimony was admissible as a statement against interest because it plainly incriminated Brady, and Brady's statements were corroborated.  Brady's statements were made under oath and they were consistent with other evidence discovered by law enforcement officers during their investigation.  The exclusion of Brady's grand jury testimony not only violated the rules of evidence, but

it also undermined defendant's constitutional right to present a defense. Brady's grand jury testimony significantly undermined James Reed's version of events, and the believability of James' testimony was a central component of the government's case. A remand for further proceedings, which may include a new trial, is required.

2. Viewing all the evidence in the light most favorable to the government, as a matter of law, the government failed to prove that defendant conspired with James and Jariel to dismember and burn Dhamyl's body, or that defendant personally used fire to destroy Dhamyl's remains. Accordingly, defendant's convictions on Counts 8 and 10 through 13 offend due process principles. Vacatur and resentencing are required.

3. Likewise, the government failed to present legally sufficient proof in support of the jury's drug-quantity calculation. As a matter of law, defendant is responsible only for the quantity of drugs that are foreseeable as to him. Viewing the evidence in the light most favorable to the government, the government failed to prove that defendant was culpable for more than three kilograms of cocaine. The proper remedy is to remand the case for resentencing on the narcotics conspiracy charge.

25

## Argument

**Point 1:    The district court erred by prohibiting defendant from introducing portions of Brady's grand jury testimony.**

## I.    Preservation and standard of review

### A.    Preservation

This issue is preserved.  In December 2019, Richard Brady entered into a proffer agreement with the government and testified before the grand jury in this case.  (A—73).  Among other things, Brady told the grand jurors that he would sometimes store drugs or weapons for James at a house that Brady rented.  (A—74).  Brady testified that in September 2019, James gave him, *inter alia*, a small cooler containing a kilogram of cocaine, a ring, a necklace with an "M" pendant,[9] and two debit cards with female names, one of which had the name "Nicole" on it.  (A—74).  Brady said that the kilogram of cocaine was wrapped in newspaper that appeared to be in a language other than English, and that it might have been Spanish, but he could not be sure.  (A—74).

---

[9]    The reader will, of course, recall that one of the decedents was named "Miguel."  The government maintains that there is an error in the grand jury transcript and that Brady actually referenced an "N" pendant.  (A—74 n.4).  The reader will recall that one of the victims was named Nicole.

26

Although the government ultimately determined that Brady's grand jury testimony was not credible,[10] (A—75), it was at least partially corroborated by the investigation. For example:

*One*, law enforcement agents who searched the hotel room that the decedents rented on September 15, 2019, discovered two kilograms of cocaine wrapped in "Spanish newspaper, the writing, the language was all in Spanish," concealed in the false bottom of a cooler bag. (Tr. 529, 594).

*Two*, Dhamyl carried the cocaine into the house inside what looked like a "book bag." (Tr. 2476, 2487-88).

*Three*, Nicole had a penchant for wearing an "N" pendant. The medical examiner who autopsied Nicole discovered "a yellow metal chain necklace around [Nicole's] neck with a pendant in the shape of the letter N and [it] had numerous tiny clear stones." (Tr. 911).

---

[10] James was asked about Brady during his own trial testimony. James contradicted trivial portions of Brady's grand jury testimony, such as where he first met Brady, what they discussed while playing poker when Brady was incarcerated with James at the Niagara County Jail, and whether James ever sold drugs to Brady. (A—76).

Defendant wanted to call Brady to testify as part of his defense case-in-chief. (A—77). The government responded that Brady's grand jury testimony implicated him in criminal conduct and was perjurious, and it refused to immunize Brady from prosecution if he testified at trial. (A—77). Brady was brought before the Court and, in due course, he invoked his Fifth Amendment privilege and declined to answer questions. (A—77).[11] The Court then entertained oral and written arguments from the parties about whether any portion of Brady's grand jury testimony was admissible under, *inter alia*, Rule 804(b)(3) of the Federal Rules of Evidence. *See e.g.* Tr. 3405-36; Dkt. 561 (Defendant's Memorandum of Law Regarding Federal Rules of Evidence 804(b)(3) and 613(b)). The district court orally denied defendant's request to present any portion of Brady's grand jury testimony, (Tr. 3453), followed by a written Decision and Order on the matter, (A—72-91). Defendant renewed his objection to the district court's ruling regarding Brady's grand jury testimony in his motion to vacate the convictions and for a new trial. (Dkt. 582, p. 19-28). The district court declined to enter a

---

[11]    Defendant does not challenge the propriety of his invocation.

judgment of acquittal based on "the preclusion of Richard Brady's grand jury testimony." (A—98-99).

## B.    Standard of review

Whether a ruling by the district court violated a defendant's constitutional right to present a defense is a question of law. This Court reviews questions of constitutional law *de novo*. *See e.g. United States v. Tropeano*, 252 F.3d 653, 657 (2d Cir. 2001) (This Court will review a district court's "application of constitutional standards *de novo*.").

This Court will review a district court's decision to exclude a statement under Rule 804(b)(3) for abuse of discretion. *United States v. Lumpkin*, 192 F.3d 280, 287 (2d Cir. 1999). A court abuses its discretion when its evidentiary rulings are "arbitrary and irrational." *United States v. Paulino*, 445 F.3d 211, 217 (2d Cir. 2006). An erroneous evidentiary ruling warrants a new trial "only when a substantial right of a party is affected, as when a jury's judgment would be swayed in a material fashion by the error." *Lore v. City of Syracuse*, 670 F.3d 127, 155 (2d Cir. 2012) (internal quotation marks omitted).

## II.    The legal framework

Criminal defendants enjoy a constitutional right to present a defense that may permit the admission of information otherwise barred by the rules of evidence. *Chambers v. Mississippi*, 410 U.S. 284, 302-03 (1973). The exclusion of evidence at a criminal trial that had "persuasive assurances of trustworthiness" and was "critical" to the defense violates both the Due Process Clause, *id.* at 302, and the Sixth Amendment's Compulsory Process Clause, which guarantees criminal defendants the right to call witnesses in their favor, *Crane v. Kentucky*, 476 U.S. 683, 690 (1986).

The right to present a defense "offers a shield for defendants when evidentiary rules thwart their attempts to protect themselves at trial." Daniel S. Medwed, *Secrets of Chambers: The Constitutional Right to Present a Defense at Middle Age*, 66 Ariz. L. Rev. 571, 575 (2024). The rules of evidence "may not be applied mechanistically to defeat the ends of justice," *Chambers* 410 U.S. at 302, and "[t]he rights to confront and cross-examine witnesses and to call witnesses on one's own behalf have long been recognized as essential to due process," *id.* at 294. As the Court has repeatedly observed, "at a minimum,…criminal defendants have the

right to put before a jury evidence that might influence the determination of guilt." *Taylor v. Illinois*, 484 U.S. 400, 408 (1988) (quoting *Pennsylvania v. Ritchie*, 480 U.S. 39, 56 (1987)) (cleaned up).

Rule 804(b)(3) of the Federal Rules of Evidence exempts from the general hearsay rule a statement made by an unavailable declarant[12] that:

> (A) a reasonable person in the declarant's position would have made only if the person believed it to be true because, when made, it was so contrary to the declarant's proprietary or pecuniary interest or had so great a tendency to invalidate the declarant's claim against someone else or to expose the declarant to civil or criminal liability; and
>
> (B) is supported by corroborating circumstances that clearly indicate its trustworthiness, if it is offered in a criminal case as one that tends to expose the declarant to criminal liability.

"The [threshold] question under Rule 804(b)(3) is always whether the statement was sufficiently against the declarant's penal interest that a reasonable person in the declarant's position would not have made the

---

[12]    Invocation of a declarant's Fifth Amendment privilege renders Brady "unavailable" for purposes of Fed R Evid. 804(b). *United States v. Dolah*, 245 F.3d 98, 102 (2d Cir. 2001).

31

statement unless believing it to be true, and this question can only be answered in light of all the surrounding circumstances." *Williamson v. United States*, 512 U.S. 594, 603-04 (1994) (internal quotation marks omitted).

If a court finds that the statement is against the declarant's penal interest, then a court must next "determine whether there are corroborating circumstances indicating both the declarant's trustworthiness and the truth of the statement." *United States v. Gupta*, 747 F.3d 111, 127 (2d Cir. 2014) (cleaned up). The "inference of trustworthiness from the proffered 'corroborating circumstances' must be strong, not merely allowable." *United States v. Salvador*, 820 F.2d 558, 561 (2d Cir. 1987). The burden is on the proponent of Rule 804(b)(3) evidence to demonstrate sufficient corroboration. *United States v. Paulino*, 445 F.3d 211, 220 (2d Cir. 2006).

Instruction from *Holmes v. South Carolina*, 547 U.S. 319, 330 (2006) is pertinent in this regard: a court may not rely on the strength of the prosecution's evidence to determine admissibility. "[B]y evaluating the strength of only one party's evidence, no logical conclusion can be

32

reached regarding the strength of contrary evidence offered by the other side to rebut or cast doubt." *Id.* at 331.

## III. Application

Brady's grand jury testimony about the incident in September 2019 in which he received from James a cooler containing a kilogram of cocaine wrapped in (non-English, possibly Spanish-language newspaper), a debit card for "Nicole" and a pendant of the letter "M" (or "N") qualifies for admission under Rule 804(b)(3).

*One*, these statements were plainly inculpatory. Brady admitted possessing a kilogram of cocaine, and that's not permitted by law. Brady also acknowledged receiving things from James that any reasonable person would have understood did not belong to him. There is no rational explanation as to why James might possess debit cards issued to other people.[13] The government understood that Brady's testimony to this

---

[13]    Respectfully, the district court's conclusion to the contrary sanitizes the facts. According to the district court, "[t]here is nothing illegal, without more, about holding two debit cards and some jewelry for an associate." (A—85). But of course, there is something *highly* suspect about holding debit cards made out to unknown third parties with no obvious relationship to the giver. *See e.g. United States v. Rosario*, 7 F.3d 319, 320 (2d Cir. 1993) (the police found it suspicious that the defendant possessed seven credit cards each bearing a different name). Other similar examples are too numerous to cite.

effect was going to inculpate him, which is why they offered him a proffer agreement. The district court understood these admissions were inculpatory, which is why it permitted Brady's Fifth Amendment invocation.

*Two*, the plainly inculpatory nature of Brady's statements was never mitigated. The government refused to immunize Brady, and the proffer agreement almost certainly provided Brady with no protection because "[t]he government determined that it did not find Brady's testimony before the grand jury credible…." (A—75; *see also id.* ("Brady did not ultimately receive any benefit from his proffer agreement.")). Of course, the government's view of credibility by itself is of no bar to admission because credibility determinations are reserved for the jury. For the same reason, Brady's imagined motivation for making his statements is not relevant, either. Rule 804(b)(3)(A) embodies an objective measure – whether "a reasonable person in the declarant's position would have made [the statement] only if the person believed it to be true"[14] – and anyways, even if Brady's statements were *exclusively*

---

[14] Respectfully, the district court's supposition that a reasonable person in Brady's situation might fabricate grand jury testimony is

34

motivated by a desire to curry favor with the prosecution, he failed, completely, in that regard. Brady's motivations, to the extent that they are relevant at all, are only relevant to whatever weight the factfinder might opt to give his inculpatory statements.

*Three*, Brady's statements were sufficiently corroborated, as discussed *supra*. Brady's statement that he took possession of a kilogram of cocaine (obviously inculpatory), which was wrapped in a unique style of newspaper and placed inside a cooler, along with a debit card belonging to "Nicole" and a necklace with an "M" or "N" pendant, is fully consistent with other evidence the government adduced at trial. It tracks with what law enforcement agents discovered when they searched the decedents' hotel room, *i.e.* kilograms of cocaine wrapped in Spanish-language newspaper discovered inside a cooler bag; it is consistent with testimony that Dhamyl carried drugs in what looked like a "book bag;" and it comports with the medical examiner's testimony that Nicole fancies such jewelry because at the time of her death, she was wearing an "N" pendant around her neck.

---

untenable and inconsistent with the rule of law. (A—85). The law does not presume that witnesses commit perjury.

Respectfully, the district court's decision that reliability is lacking because, *inter alia,* defendant failed to establish that the cocaine delivered to Roebling was *also* wrapped in similar newspaper is precisely the sort of stringency that *Chambers* and *Holmes* prohibit. (A—87). Contrary to the district court's reasoning, the fact that Brady made his statements under oath to the grand jury is not, as the district court reasoned, the only indication of reliability. (A—86). Nor does it matter that other statements made by Brady – which defendant either did not seek to admit or the exclusion of which he does not challenge – lack similar corroboration. (A—86-87). Were Brady permitted to testify, the government would have ample opportunity for cross-examination.

The exclusion of key portions of Brady's grand jury testimony was inconsonant with both Rule 804(b)(3) and defendant's constitutional right to present a defense. The proper remedy is to remand the case for further proceedings, which may include a new trial.

**Point 2:** **Defendant's convictions for conspiracy to obstruct justice (Count 8); obstruction of justice (Count 10); conspiring to use fire to commit a felony (Count 11); and use of a fire to commit a felony (Counts 12 and 13), are unsupported, as a matter of law.**

Count 8 alleged that defendant conspired with James and Jariel to, *inter alia*, destroy, alter, and mutilate Dhamyl's body. (A—66). Count 10 alleged that defendant destroyed, altered, and mutilated Dhamyl's body. (A—67). Count 11 alleged that defendant conspired to use fire to commit the crimes alleged in Counts 8, 9, and 10. (A—68). Counts 12 and 13 alleged that defendant used fire to commit the crimes alleged in Counts 8 and 9, and Counts 8 and 10, respectively. (A—68-69).

Even viewing the evidence in the light most favorable to the government, the government failed to prove that defendant dismembered or burned Dhamyl's body, or that he conspired with others to do so. Thus, defendant's convictions on Counts 8, 10, 11, 12, and 13, are unsupported as a matter of law. Vacatur and resentencing are required.

## I. Preservation and standard of review

### A. Preservation

The insufficiency-of-the-evidence argument that defendant advances herein is preserved. Defendant moved at the close of the

37

government's proof and after the close of all the evidence to dismiss the charges under Rule 29 of the Federal Rules of Criminal Procedure. (Tr. 3326, 3463). The district court reserved its decision. (Tr. 3333). After the verdict, defendant timely filed a written motion to vacate his convictions and for a new trial pursuant to Rules 29 and 33 of the Federal Rules of Criminal Procedure. (A—93). Defendant argued, *inter alia*, that:

> The evidence at trial showed it was [Jariel] and [James] who dismembered and burned the body of Dhamyl…. The mere presence of [defendant] during the burning of the [body] as well as mere knowledge of burning the [body] is not sufficient to convict him of the said charges. [Defendant] was not present during the mutilation and removal of Dhamyl's body to the fire pit on Box Avenue.
>
> * * * * *
>
> The trial testimony shows it was [James] and [Jariel] who built and maintained the fire pit on Box Avenue. It was [James] and [Jariel] who started the fire and brought the body of Dhamyl to the fire. [Defendant] was not present or involved in any of this. Nor did he enter into an agreement for this to be done.

Dkt. 582, p. 10-11.

By written Decision and Order, the district court denied defendant's motion to vacate and for a new trial. (A—122). Regarding the obstruction

of justice and use of fire counts (including Counts 8, 10, 11, 12, and 13), the court reasoned:

> Turning first to the obstruction and use of fire charges as they pertain to the body of Dhamyl, while the trial testimony established that [Jariel] dismembered her body and that [Jariel] and [James] manned the firepit to ensure that it was properly burning her body, [Jariel] and [James] both testified that [defendant] was also at the fire during that time.

(A—114).  In support, the court cited various portions of the record:[15]

> [Jariel's] testimony that "the three of them" were back at the fire to "make sure it stayed burning," and each of them participated, including that Defendant "grabbed the ice pick and…stirred though the fire." (Tr. 2663).  [James'] testimony that he, Defendant, and [Jariel] were back at the fire during the early morning of September 16, 2019.  (Tr. 1789-1794).  Defendant was also seen on video surveillance arriving at 225 Box during the early morning hours.

(A—114).  The district court concluded: "Accordingly, there was sufficient evidence of Defendant's personal involvement with the destruction of Dhamyl's body to support his convictions for the obstruction and use of fire charges." (A—114-15).  In a footnote, the court added:

> The jury was also charged on aiding and abetting and vicarious liability under *Pinkerton v. United States*, 328 U.S.

---

[15]    Defendant has amended the court's record citations to reflect the official transcripts and moved them to the end of each assertion.

640 (1946), which separate and apart from Defendant's personal involvement, would also support the jury's verdict with respect to one or more of the counts involving the destruction of Dhamyl's body.

(A—115 n. 11).

### B.    Standard of review

This Court will review the denial of a Rule 29 motion *de novo*. *United States v. Gershman*, 31 F.4th 80, 95 (2d Cir. 2022), *cert. denied*, 143 S.Ct. 816 (2023).

## II.    The legal framework

### A.    Rule 29 motions

This Court has instructed:

To reverse a conviction on appeal, a defendant carries a heavy burden. To prevail, he must show that no rational trier of fact could have found all the elements of the crime beyond a reasonable doubt. In evaluating a sufficiency challenge, [a reviewing court] must view the evidence in the light most favorable to the government, crediting every inference that could be drawn in the government's favor, and deferring to the jury's assessment of witness credibility and its assessment of the weight of the evidence.

*United States v. Turner*, 2023 U.S. App. LEXIS 20674, *7-8, 2023 WL 5091187 (Aug. 9 2d Cir. 2023) (cleaned up).

A conviction that is not supported by legally sufficient evidence violates federal due process principles. *See Jackson v. Virginia*, 443 U.S. 307, 318-19 (1979) (The Fourteenth Amendment requires record evidence to reasonably support a finding of guilt beyond a reasonable doubt).

### B.   Duplicity

Count 8 (conspiracy to obstruct justice) alleged a conspiracy to destroy and conceal the bodies of Miguel, Nicole, *and* Dhamyl, *and* the white minivan.   (A—66).   Count 10 (obstruction of justice) pertains exclusively to the destruction and concealment of Dhamyl.   (A—67). Count 11 (conspiracy to use fire to commit a felony) and Counts 12 and 13 (use of a fire to commit a felony) each contain a cross-reference to Count 8; Counts 11 and 13 also contain a cross references to both Counts 8 and 10.   (A—68-69).

Duplicity refers to the combination of "two or more distinct crimes into one count." *United States v. Sturdivant*, 244 F.3d 71, 75 (2d Cir. 2001).[16]   Defendant did not argue below – and thus, he does not argue now on appeal – that the indictment was impermissibly duplicitous.

---

[16]   Defendant maintains that the government could have separately charged conspiracy to obstruct justice, conspiracy to commit a felony, and the use of fire charges, for each named victim and object.

However, because the verdict sheet did not specify the factual basis for Counts 8 or 11 through 13, (*see* Dkt. 558), the point, as it relates, to legal insufficiency, is that if the evidence was legally insufficient regarding Dhamyl, then vacatur is required even if the jurors could (hypothetically-speaking) have found defendant guilty regarding the other objects alleged in the indictment, *i.e.* the other victims and the minivan. This is so because, as part of its charge, the district court invited the jurors to find defendant guilty if he "altered, destroyed, mutilated, or concealed any object as alleged in the indictment." (Tr. 3617).

### C.   Vicarious criminal liability

Under *Pinkerton*, "[o]nce a conspiracy has been established, the criminal liability of its members extends to all acts of wrongdoing occurring during the course of and in furtherance of the conspiracy." *United States v. Gallerani*, 68 F.3d 611, 620 (2d Cir. 1995). That said, *Pinkerton* is not a broad principle of vicarious liability that imposes criminal responsibility upon every co-conspirator for whatever substantive offenses any of their confederates commit. *United States v. Bruno*, 383 F.3d 65, 90 (2d Cir. 2004) (quotation marks omitted). Instead,

*Pinkerton* provides that "a defendant who does not directly commit a substantive offense may nevertheless be liable if the commission of the offense by a co-conspirator in furtherance of the conspiracy was reasonably foreseeable to the defendant as a consequence of their criminal agreement." *United States v. Parkes*, 497 F.3d 220, 232 (2d Cir. 2007) (quotation marks omitted); *Pinkerton*, 328 U.S. at 648 (a defendant may not be held vicariously liable for a crime that "was merely a part of the ramifications of a plan which could not reasonably foreseen as a necessary or natural consequence of the unlawful agreement.").

Moreover, whereas a defendant may be legally responsible for foreseeable acts of coconspirators prior to the defendant's entry into the conspiracy, not so regarding substantive offenses. *United States v. Rea*, 958 F.2d 1206, 1214 (2d Cir. 1992). Regarding substantive offenses, a defendant cannot be retroactively liable for offenses committed prior to his joining the conspiracy. *United States v. Blackmon*, 839 F.2d 900, 908-09 (2d Cir. 1998).[17]

---

[17]    *See also United States v. Dickerson*, 508 U.S. 1216, 1217-18 (2d. Cir. 1975) (Even under an "aiding and abetting" theory of liability, "it must be proved that the defendant consciously assisted in the commission of the crime in some active way.").

43

### III. Application

Viewing the evidence in the light most favorable to the government, both James and Jariel testified that after defendant shot the occupants of the van, he drove the van away from Roebling Avenue, went to a music concert, and did not rejoin James and Jariel until *hours* after *they* dismembered and burned Dhamyl's body. Jariel testified that it was *his* idea to dismember Dhamyl's body. Jariel's testified that it was *his* idea to burn Dhamyl's body in the firepit at Box Avenue. Neither Jariel nor James ever discussed the dismemberment and disposal of Dhamyl's body with defendant before *they* did those things. There is no proof of any kind of an agreement involving defendant regarding Dhamyl – much less an agreement of specifically how to handle Dhamyl's corpse, *i.e.* to use fire to dispose of it. Respectfully, there were innumerable ways that James and Jariel could have disposed of evidence (for example, defendant allegedly disposed of the murder weapon by throwing it in a lake). No one specific way was more foreseeable than the next.

Nor is there any record evidence from which such an agreement might be inferred. This Court has repeatedly instructed that a person's mere presence, even coupled with the knowledge of criminal activity, is

insufficient to establish membership in a conspiracy. *See United States v. Gaviria*, 740 F.2d 174, 184 (2d Cir. 1984) (so stating); *see also United States v. Soto*, 716 F.2d 989, 991 (2d Cir. 1983) (defendant's "sustained and regular presence" in an apartment in which guns and narcotics were found was insufficient by itself to sustain a conspiracy conviction); *United States v. Johnson*, 513 F.2d 819, 823-24 (2d Cir. 1975) (Absent evidence of purposeful behavior to further the alleged conspiracy, mere presence at the scene of a crime, even coupled with knowledge that at that moment a crime is being committed, is insufficient to prove membership in a conspiracy.). Because there was no conspiracy, defendant could not have been vicariously liable for decisions made by James and Jariel that did not involve him.

*Long* after Dhamyl's body had disintegrated in the firepit – sometime after 3:20 a.m. on the morning of September 16, 2019, (Tr. 2661) – defendant stood by the fire for about an hour and, at one point, "[h]e grabbed the ice pick and like stirred through the fire, (Tr. 2663). At that time, all the substantive offenses had all been completed. Even assuming *arguendo* that this eleventh-hour conduct somehow established defendant's membership into the *conspiracies* contemplated

45

by Count 8 (conspiracy to obstruct justice) and Count 11 (conspiracy to use fire to commit a felony) – a proposition defendant strongly contests – it does not somehow give rise to retroactive liability for the substantive offenses contemplated by Counts 10, 12, and 13.

Respectfully, because the government failed to present legally sufficient proof to support Counts 8 and 10 through 13, the district court erred by denying defendant's Rule 29 motion, and in doing so, violated defendant's due process rights guaranteed by the Fourteenth Amendment. The district court then compounded the error by denying defendant's motion for a new trial. *See United States v. Archer*, 977 F.3d 181, 187 (2d Cir. 2020) (a district court may grant a new trial if the evidence does not support the verdict). The proper remedy is to vacate defendant's convictions on Counts 8 and 10 through 13 and remand the case for resentencing.[18]

---

[18]     Aside from the fact that defendant's convictions on Counts 8 and 10 through 13 necessarily impacted the district court's evaluation of the 3553(a) factors, resentencing is required because the district court ordered the sentences on Counts 12 and 13 (which totaled 30 years) to run consecutively to all other counts. (A—124). *See* 18 U.S.C. § 3553(a).

**Point 3:** **The jury's finding that the sale of at least five kilograms of cocaine was attributable to defendant, through his participation in the narcotics conspiracy alleged in Count 1, was unsupported as a matter of law.**

The jury finding that the sale of five kilograms or more was attributable to defendant triggered a minimum mandatory 10-year prison sentence. Dkt. 558, p. 1; 21 U.S.C. 841(b)(1)(A)(ii)(II). Defendant's prior conviction of a serious violent felony elevated the minimum mandatory term to 15 years' prison. *Id.*; PSR ¶ 98.

## I.  Preservation and standard of review

### A.  Preservation

This issue is preserved.  In his post-verdict motion to vacate the convictions and for a new trial, defendant argued:

> The amount of cocaine attributable to [defendant] at most, based on the trial testimony, is 1 kilogram, possibly 3 kilograms.  This would include the alleged 2 occasions in which [defendant] was unavailable to attend the drug transaction because of work, and the incident on September 15, 2019.  There is no testimony or evidence that the 2 kilograms of cocaine found in [the victims' hotel room] were part of [Jariel's] narcotic trafficking activities.  In fact, the evidence is to the contrary.  If the 2 kilos in the hotel were for [Jariel], Miguel and Dhamyl would have brought it to the 4 Roebling drug transaction on September 15, 2019.  There is

47

> ample evidence and trial testimony that Miguel and Dhamyl
> were dealing with other drug traffickers, separate and apart
> from [Jariel] in the Buffalo area.

Dkt. 582, p. 6.

The district court disagreed. In its Decision and Order denying

defendant's motion, the district court said:[19]

> For the cocaine, Defendant personally participated in at least
> the drug transaction on September 15, 2019, and he
> attempted to participate on two prior occasions in similar
> drug transactions involving these victims' deliveries of
> cocaine. The proof at trial showed that each of [Jariel's]
> dealings with the victims typically involved three kilograms
> of cocaine and sometimes as much as six kilograms, and
> between March 2019 and September 1, 2019, [Jariel] made
> nine or 10 cocaine deals with the victims. (Tr. 2424).
> Consistent with this practice, the victims had two additional
> kilograms of cocaine back in their hotel room on September
> 15, 2019, so there is a fair inference that this was intended to
> be part of the drug transaction with [Jariel] and his co-
> conspirators. Likewise, there is a fair inference that a total of
> at least six kilograms of cocaine was involved in the two prior
> occasions where Defendant attempted to personally
> participate in the transactions. Thus, viewing the evidence in
> the light most favorable to the government and drawing all
> permissible inferences in its favor, the transaction on
> September 15 alone – in which Defendant personally
> participated – involved three kilograms of cocaine, and the

---

[19]   Again, defendant amends the district court record citations so that
they correspond with the official transcript.

two prior occasions that Defendant tried to participate [in] involved at least an additional six kilograms of cocaine. As a result, it was rational for the jury to conclude that at least five kilograms or more of cocaine was reasonably foreseeable to Defendant as part of the narcotics conspiracy that he joined, if not directly involved in the drug transactions in which he personally participated or attempted to participate.

(A—104-05).

Relying on *Pinkerton* liability, the district court added that "there is no question" that Jariel's "drug trafficking organization dealt with significant levels of cocaine" and thus, "a reasonable jury could conclude that the cocaine trafficked prior to his joinder in the conspiracy was reasonably foreseeable to Defendant and within the scope of his agreement." (A—104-05). According to the district court: "Thus, under those circumstances, the five kilogram threshold of cocaine is exceeded by many kilograms." *Id.* at 15.

## B. Standard of review

When the quantity of drugs involved in a crime raises a defendant's sentence above the statutory maximum established in 21 U.S.C. § 841(b)(1)(C), quantity is an element of the offense. *United States v. Thomas*, 274 F.3d 655, 663 (2d Cir. 2001) (en banc). The government must prove the drug quantity element beyond a reasonable doubt. *Id.*

49

Thus, defendant incorporates here his discussion, *supra*, of the standard of review for claims of insufficiency of the evidence. *See also United States v Pauling*, 924 F.3d 649, 655-56 (2d Cir. 2019) (applying that standard of review to a drug quantity calculation). Defendant also incorporates his discussion, *supra*, of the legal framework for evaluating insufficiency-of-the-evidence arguments, and he reiterates that due process requires that "no person shall be made to suffer the onus of a criminal conviction except upon sufficient proof." *Jackson*, 443 U.S. at 316.

## II. The legal framework

This Court has admonished: "Where a fact to be proved is also an element of the offense – here, drug quantity – it is not enough that the inferences in the government's favor are permissible. We also must be satisfied that the inferences are sufficiently supported to permit a rational juror to find that the element, like all elements, is established beyond a reasonable doubt." *Pauling*, 924 F.3d at 657 (quoting *United States v. Martinez*, 54 F.3d 1040, 1043 (2d Cir. 1995)) (cleaned up).

The drug quantity attributable to a defendant knowingly participating in a drug distribution conspiracy includes:

> (1) Transactions in which he participated directly, (2) transactions in which he did not personally participate,

50

> but where he knew of the transactions or they were
> reasonably foreseeable to him, and (3) quantities he
> agreed to distribute or possess with intent to distribute
> regardless of whether he ultimately committed the
> substantive act.

*Pauling*, 924 F.3d at 657 (quoting *United States v. Jackson*, 335 F.3d 170, 181 (2d Cir. 2003)).

In *United States v. Martinez*, 987 F.2d 920 (2d. Cir. 1993), this Court made plain that 21 U.S.C. § 841(b) contains a reasonable foreseeability requirement, meaning that a defendant is not liable for "any crimes committed by any other members of the conspiracy, regardless of the defendant's knowledge about those crimes." *Id.* at 924. Rather:

> In multi-level drug networks, defendants may aid
> conspiracies that span far beyond their actual participation.
> For activities of a co-conspirator to be "reasonably
> foreseeable" to a defendant, they must fall within the scope of
> the agreement between the defendant and the other
> conspirators…. Thus, if a defendant agrees to aid a large-
> volume dealer in completing a single, small sale of drugs, the
> defendant will not be liable for prior or subsequent acts of the
> dealer that were not reasonably foreseeable.

*Id.* at 925 (citing favorably *United States v. Jones*, 965 F.2d 1507, 1517 (8th Cir.), *cert. denied* 121 L.Ed.2d 261 (1992)). This, of course, is

concomitant with *Pinkerton*, which holds that a conspirator could be held accountable for any acts *reasonably foreseeable* in furtherance of the conspiracy. *Pinkerton*, 328 U.S. at 646-48.

## III. Application

Taking the *Pauling* criteria in turn, defendant is responsible, *first*, for the drug quantity of the "transactions in which he participated directly." *Pauling*, 924 F.3d at 657. The uncontroverted evidence is that on September 15, 2019, defendant intended to purchase one kilogram of cocaine from the decedents.[20] Additionally, the uncontroverted evidence is that Jariel planned to purchase for himself and the other members of his conspiracy whatever remaining quantity the decedents brought to Roebling.

The notion that defendant *also* intended to purchase any other quantity of drugs possessed by the decedents, but not on offer to either him or Jariel – *i.e.* any drugs left by the decedents at the hotel – is speculative and not in any way supported by the record evidence. In fact,

---

[20]     After September 15, 2019, defendant asked Jariel if he would help him sell the kilogram of cocaine that he took from Dhamyl. (Tr. 2673). The notion that this kilogram came from any other source is utterly speculative.

it is *controverted* by the commonsense conclusion that if those drugs were not offered by the decedents to either defendant or Jariel, then they are not part of any transaction in which defendant participated directly. Inferences in support of drug quantity calculations that alter the statutory minimum cannot be speculative or simply just "permissible"; rather, the government must establish such inferences "beyond a reasonable doubt," and it has not done so in this regard. *Martinez*, 54 F.3d at 1043.

Nor is defendant responsible for the drugs that Jariel intended to purchase on September 15, 2019 or on any other occasion for himself and his other investors.[21] According to the government's theory of the case, Jariel had a "hub-and-spoke" or "wheel" conspiracy, where Jariel acted as a central point (the hub) and other people had their own agreements with the central actors (the spokes). *See Kotteakos v. United States*, 328

---

[21] Respectfully, the district court's conclusion that because defendant was "aware of the conspiracy's objective to sell heroin," one kilogram or more of heroin is appropriately attributable to him, (Dkt. 558 p. 2 (verdict sheet); A—104), is wrong. As discussed *supra* p. 45, knowledge and foreseeability are not synonymous. On top of that, the court's foundational assumption is wrong; there is no evidence that defendant knew Jariel and James trafficked in heroin; there is no proof the men ever discussed heroin.

U.S. 750, 754-55 (1946). Put another way, in a hub-and-spoke conspiracy, "members of the 'core' group deal with a number of contacts who are analogized to the spokes of a wheel and are connected with each other only through the core conspirators." *United States v. Manarite*, 448 F.2d 583, 589 (2d Cir. 1971). And absent a "rim" around the spokes, such that the "spokes" become conspirators with each other, there is no single conspiracy encompassing all the spokes. *United States v. Zabare*, 871 F.2d 282, 287 (2d Cir. 1989). The common theme of the government's case was that defendant's desire to become a kilogram-quantity drug dealer was entirely aspirational anyways because he didn't have the cash to get going, and no one was going to "front" him the drugs. (*See e.g.* Tr. 2427).[22]

Viewing the evidence in the light most favorable to the government, defendant's "spoke" involved him (hypothetically, because it never

---

[22] So, too, regarding the jury's finding that defendant was responsible for 100 kilograms or more of marijuana. (Dkt. 558, p. 3). The district court correctly noted that, "with the marijuana, Defendant was personally involved in the distribution of that drug." (A—106). But the evidence showed that defendant and Jariel discussed the sale of one *pound* of marijuana. Defendant may have been aware that Jariel trafficked in large quantities of marijuana, but again, knowledge does not equal foreseeability.

actually came to fruition) getting drugs from Jariel (the hub), and then acting as a middleman to facilitate his cousins' portion of Jariel's distribution network. (*See e.g.* Tr. 2406-07 (Jariel already had an established drug-dealing relationship with defendant's cousins)). Jariel testified about many other investors, *i.e.* people with whom he pooled money to purchase large quantities of drugs, and he explained that these large quantities were apportioned wholesale to each investor, with Jariel keeping a portion for himself to resell either in wholesale or retail quantities.

The only connection between defendant and these other investor-spokes, or with defendant's own wholesale or retail customers, is the hub, *i.e.* Jariel. There is no evidence of a rim, or of defendant's knowledge of a rim. The drugs intended for distribution by Jariel (in his individual capacity) or by Jariel's other investor-spokes, are not attributable to defendant. *Cf. Martinez*, 54 F.3d at 925 (the foreseeability requirement exists so that a defendant who "agrees to aid a large-volume dealer in completing a single, small sale of drugs…will not be liable for prior or subsequent acts of the dealer that were not reasonably foreseeable.").

*Second*, "transactions in which [defendant] did not personally participate, but where he knew of the transactions or they were reasonably foreseeable to him" are attributable to him as part of the drug quantity calculation. *Pauling*, 924 F.3d at 657. *Third*, "quantities [defendant] agreed to distribute or possess with intent to distribute regardless of whether he ultimately committed the substantive act" are likewise attributable to him. *Id.* (internal quotation marks omitted). Jariel testified that on two occasions before September 15, 2019, defendant agreed to purchase one kilogram of cocaine. (Tr. 2450-51). But defendant never actually purchased anything on these occasions, either because he didn't have the money or because he did not return Jariel's phone calls. (Tr. 2451-52). Assuming *arguendo* that defendant's attempted purchase of two kilograms qualifies for purposes of the *Pauling* test, the total drug weight attributable to defendant is three kilograms, not five or more.

Because the government failed to establish beyond a reasonable doubt that the drug quantity personally foreseeable and attributable to defendant was at least five kilograms, the district court erred when it overruled defendant's Rule 29 argument in this regard. The proper

remedy is to vacate this aspect of defendant's conviction and remand for further proceedings, which may include new findings about drug quantity and resentencing.

## Conclusion

Defendant prays that this Court grants the relief requested within each assignment of error.

Dated: December 2, 2024

Respectfully submitted,
DEANDRE WILSON
By his attorney:

/s/ Jamesa J. Drake
Jamesa J. Drake
Drake Law LLC
P.O. Box 56
Auburn, ME 04212
(207) 330-5105

## Certificate of Compliance with Rule 32(A)

**RE:**     ***United States v. Deandre Wilson***
       **Docket No. 23-6307**

**Certificate of Compliance with Type-Volume Limitation, Typeface Requirements, and Type Style Requirements:**

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 11,654 words, excluding the part of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using MSWord, Century Schoolbook, 14 point.

I understand that a material misrepresentation can result in the Court striking the brief or imposing sanctions. If the Court so directs, I will provide a copy of the words or line print-out.

Dated: December 2, 2024

/s/ Jamesa J. Drake
Jamesa J. Drake
Drake Law LLC
P.O. Box 56
Auburn, ME 04121
(207) 330-5105

## Certificate of Service

I, Jamesa J. Drake, hereby certify that I have served a copy of this Appellant's brief upon the United States by virtue of filing this brief through the Circuit Court's ECF System, causing a copy to be distributed to all relevant parties.

Dated: November 29, 2024

/s/ Jamesa J. Drake
Jamesa J. Drake
Drake Law LLC
P.O. Box 56
Auburn, ME 04121
(207) 330-5105